UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DAVID J. LINDSAY,

                Plaintiff,

vs.                         Case No.  2:04-cv-460-FtM-29DNF

SHERIFF DON HUNTER, CAPTAIN CHRIS
FREEMAN, COMMANDER JOE BASTYS,
SERGEANT BARBARA ANN HANSEN and DAWN
CULLEN #2458,

                Defendants.

_____

**OPINION AND ORDER**

**I.**

This matter comes before the Court upon review of Defendants'
Amended Motion for Summary Judgment (Doc. #201, Amend. Mot. S.J.),[1]
filed May 18, 2007, and Plaintiff's Response[2] (Doc. #202,
Response).  Both Defendants and Plaintiff filed a voluminous number
of exhibits.  The Defendants exhibits are attached to their initial
Motion for Summary Judgment and include affidavits, multiple
sections of the Collier County Jail's policies, grievances

_____

[1]The Court ordered the Defendants to file the amended motion
after the Court reviewed the initial motion and found that the
Defendants failed to support their factual allegations and argument
with pinpoint citations to the record.  See Order directing Amended
Motion at Doc. #208; Witbeck v. Embry Riddle Aeronautical
University, 219 F.R.D. 540 (M.D. Fla. 2004).

[2]In light of Defendants' amended motion, the Court informed
Plaintiff that he had an opportunity to file an Amended Response.
See Order at Doc. #217.  Plaintiff did not file an Amended
Response, thus the Court relies upon Plaintiff's initial Response
(Doc. #202, Response) to Defendants' Motion for Summary Judgment.

submitted by Plaintiff with the respective responses from jail personnel dated October 2003 through July 2006, and Plaintiff's deposition testimony. See Defs' Exhs. at Docs. #135-2 thru #136-2, #137-2, #138-2 thru #189-2.[3]   In pertinent part, Plaintiff's exhibits include his grievances and respective responses (many of which duplicate the grievance exhibits filed by Defendants), additional grievances submitted by other inmates concerning "substandard" food services, lists of inmate signatures complaining in general of the conditions at the jail, Plaintiff's medical records ranging in date from 2003 through 2006, outstanding bills for outpatient services Plaintiff received from local medical facilities during his incarceration, and an affidavit signed by two inmate witnesses, William Cundiff and Richard Tyler, concerning a medical incident involving Plaintiff.   See generally Pl's Exhs. Exh. A thru Exh. I.

---

[3]For purposes of clarification, Docs #135-2 thru #136-2 consist of Plaintiff's deposition (hereinafter "Depo. Pl. Part I" and "Depo. Pl. Part II").  The Affidavits of Defendants Hunter and Batsys are attached at Doc. #137-2, Exh. A and Exh. B (hereinafter "Aff. Hunter," "Aff. Batsys").  Several sections of Collier County Jail's policies and procedures, including a variety of topics ranging from Food Services to Facility Housekeeping, are attached. See Docs. #138-2 thru #146-2, Collier County Sheriff's Office Jail Division Policy and Procedures, Exhs. 1A thru 1I.  The Affidavits of Defendants Freeman, Hansen, and Cullen are at Doc. #147-2, Exh. C , Exh. D., Exh. E (hereinafter "Aff. Freeman," "Aff. Hansen," Aff. Cullen").  Plaintiff's grievances submitted to the Collier County Jail are at Docs. #151-2 thru #189-2, Exhs. 2D thru 2AP. Because the Complaint is illegible on the Court's electronic filing system, the Court cites to the Complaint in an alpha-numeric system as numbered by Plaintiff.  The Court similarly cites to Plaintiff's exhibits, which are voluminous and, although labeled in some sort of alpha-numeric system, entirely lack organization.

## II.

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a verdict for either party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if it may affect the outcome of the suit under the governing law.  Id.  The moving party bears the burden of identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits, which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004).

To avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, which are sufficient to establish the existence of the essential elements to that party's case, and the elements on which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. at 322; Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1225 (11th Cir. 1999).  In ruling on a motion for summary judgment, if there is a conflict in the evidence the non-moving party's evidence is to be

believed and all reasonable inferences must be drawn in favor of the non-moving party. Shotz v. City of Plantation, Fl., 344 F.3d 1161, 1164 (11th Cir. 2003). Conclusory allegations based on subjective beliefs, however, are insufficient to create a genuine issue of material fact. Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000). In the summary judgment context, the Court must construe *pro se* pleadings more liberally than those of a party represented by an attorney. Loren v. Sasser, 309 F.3d 1296, 1301 (11th Cir. 2002).

Title 42 U.S.C. § 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." To establish a claim under 42 U.S.C. § 1983, a plaintiff must prove: (1) defendants deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law. Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir. 1998); U.S. Steel, LLC v. Tieco, Inc., 261 F.3d 1275, 1288 (11th Cir. 2001). In addition, a plaintiff must allege and establish an affirmative causal connection between the defendants' conduct and the constitutional deprivation. Marsh, 268 F.3d 1014, 1059 (11th Cir. 2001); Swint v. City of Wadley, 51 F.3d 988 (11th Cir. 1995); Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1541 n.1 (11th Cir. 1994).

A defendant who occupies a supervisory position may not be held liable under a theory of *respondeat superior* in a § 1983 action.  Monell v. Dep't of Soc. Serv., 436 U.S. 658, 690-692 (1978); Quinn v. Monroe County, 330 F.3d 1320, 1325 (11th Cir. 2003); Farrow v. West, 320 F.3d 1235 (11th Cir. 2003).  Supervisory liability under § 1983 will exist if the supervisor personally participated in the events, or if there is a causal connection between the action of the supervising official and the alleged constitutional deprivation.  Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).  The required causal connection can be established by a history of widespread abuse or the existence of an improper custom or policy that results in deliberate indifference to a constitutional right.  Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999).  "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous."  Braddy v. Florida Dept. of Labor & Employment Sec., 133 F.3d 797, 802 (11th Cir. 1998).  The mere right to control the jail functions and deputies is not alone sufficient without control or direction over the particular situation at issue.  Hardin v. Hayes, 957 F.2d 845, 849-50 (11th Cir. 1992); Geter v. Wille, 846 F.2d 1352, 1355 (11th Cir. 1988).  A supervisory official's failure to train subordinates does not result in liability unless the failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact and the failure has actually caused

-5-

the injury of which plaintiff complains.  Belcher v. City of Foley, Ala., 30 F.3d 1390, 1397 (11th Cir. 1994).  Only when the failure to train amounts to deliberate indifference can it be characterized as a policy or custom that is necessary for § 1983 liability to attach.  Id.

Municipalities may be held liable under § 1983, but the municipality itself must have caused the constitutional violation at issue, and it cannot be liable on a vicarious liability theory. Skop v. City of Atlanta, 485 F.3d 1130, 1145 (11th Cir. 2007)(citing Monell, 436 U.S. at 694-95); City of Canton v. Harris, 489 U.S. 378 (1989).  Therefore, to establish municipal liability plaintiff must show that: (1) his constitutional right was violated; (2) the municipality had a custom or policy that constituted deliberate indifference to her constitutional right, and (3) the policy or custom caused the violation of his constitutional right.  McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).  Plaintiff can establish the requisite "official policy" in one of two ways: (1) identifying an officially promulgated policy, or (2) identifying an unofficial custom or practice, usually shown through the repeated acts of the final policymaker of the entity.  Grech v. Clayton County, 335 F.3d 1326, 1320-30 (11th Cir. 2003).  The policy or custom must be the moving force of the constitutional violation.  Grech, 335 F.3d at 1330. See also Board of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997).

"[T]he City is not automatically liable under section 1983 even if it inadequately trained or supervised its police officers and those officers violated [plaintiff's] constitutional rights." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998).  To establish a claim against a municipality on the theory of failure to train its employees, plaintiff must establish (1) that there was a failure to adequately train the officers, (2) that the failure to train was a city policy, i.e., either there was an express policy or the failure to train amounts to "deliberate indifference" to the rights of persons with whom the officers come into contact, and (3) that the failure to train policy caused the officers to violate plaintiff's constitutional rights.  City of Canton v. Harris, 489 U.S. 378, 389-91 (1989); Bruce v. Beary, 498 F.3d 1232 (11th Cir. 2007); Gold, 151 F.3d at 1350.  Plaintiff must present some evidence that the municipality knew of a need to train in a particular area, and that the municipality made a deliberate choice not to take any action.  Gold, 151 F.3d at 1350-51.  Deliberate indifference may be established by a pattern of constitutional violations or by a single decision under appropriate circumstances. Bruce, 498 F.3d at 1249.

## III.

Plaintiff, who is proceeding *pro se*, filed his § 1983 Complaint on September 14, 2004, while a pre-trial detainee in the

custody of the Collier County Jail.[4]   (Doc. #1, Complaint).
Plaintiff sues the following individuals: Sheriff Don Hunter,
Captain Chris Freeman, Commander Joe Batsys, Sergeant of
Classifications Barbara Ann Hansen, and Dawn Cullen, a jail
technician.[5]  See Complaint at 7a; Amend. Mot. S.J. at 4. The
Complaint does not specify whether Plaintiff sues the Defendants in
their official capacities, individual capacities, or both.
Plaintiff later clarified in his Response that he intended to sue
the Defendants in both their official and individual capacities.
Response at 10.  Accordingly, the Court will construe the Complaint
as suing the Defendants in both their official and individual
capacities.  See Hobbs v. Roberts, 999 F.2d 1526, 1528-1532 (11th
Cir. 1993).

## IV.

Liberally construing the Complaint as supplemented by the
record,[6] four claims are set forth: (1) a Fourteenth Amendment

_____

[4]According to the docket history, Plaintiff is no longer
incarcerated at the Collier County Jail.  He is currently
incarcerated in Franklin Correctional Institution and in the
custody of the Florida Department of Corrections.

[5]Although Prison Health Services ("PHS") appears on the
docket, PHS is not a named Defendant in this action.  Counsel for
PHS entered an appearance in the case in order to respond to
Plaintiff's numerous emergency motions filed throughout the course
of this action.

[6]Plaintiff's Complaint contains conclusory statements with
hardly any supporting factual allegations.   See generally
Complaint at 8a-10.  Thus, the Court refers to Plaintiff's Response
and Plaintiff's testimony during his deposition for specific
(continued...)

claim against Defendants Hunter, Freeman, and Batsys for the delay or denial of medical treatment; (2) a Fourteenth Amendment claim against Defendants Hunter, Freeman, Batsys, and Hansen arising from the jail's alleged poor conditions; (3) a First Amendment claim against Defendants Hunter, Freeman, Batsys, Hansen, and Cullen based on alleged interference with Plaintiff's access to court; and (4) a First Amendment claim against Defendants Hunter, Freeman, Batsys, Hansen, and Cullen based on alleged interference with Plaintiff's outgoing mail. <u>See</u> Amend. Mot. S.J. at 5; Response 10; Depo. Pl. Part I at 19; Amend. Mot. S.J. at 5; Response at 10, Depo. Pl. Part II at 20.   As remedies, Plaintiff seeks monetary damages and injunctive relief,[7] including designing "a program to monitor and correct extensive violations of inmates' rights" and "immediately correct[ing] health and safety issues."   Amend. Complaint at 10.

**A.   Deliberate Indifference to Medical Needs Against Defendants Hunter, Freeman, Bastys:**

Plaintiff alleges he was refused treatment and/or received delayed treatment for his medical needs, including "malignant

---

[6](...continued)
factual allegations concerning his claims.

[7]Plaintiff's request for injunctive relief is moot because he is now in the custody of the Florida Department of Corrections and there is no reasonable expectation that he will return to the custody of the county jail.  <u>Siegel v. LePore</u>, 234 F.3d 1162, 1172-1173 (11th Cir. 2000)(citing <u>Reich v. Occupational Safety & Health Review Comm'n</u>, 102 F.3d 1200, 1201 (11th Cir. 1997)).

cancer," "chronic heart condition," and "degenerative back condition." Response at 14-15, 32. Additionally, Plaintiff claims he was refused dental treatment and treatment for his "serious vision needs." Id. at 15. Neither the Complaint nor Plaintiff's Response further describe Plaintiff's specific medical conditions, diagnoses, or treatments. Instead, Plaintiff generally refers the Court to his exhibits, A-1 through 109. Id. at 39.

The legal principles are well established. "[D]eliberate indifference to [the] serious medical needs of [a] prisoner [ ] constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." Farrow, 320 F.3d at 1243(quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)); Campbell v. Sikes, 169 F.3d 1353 (11th Cir. 1999). Although Plaintiff's rights as a pre-trial detainee are governed by the Fourteenth Amendment rather than the Eighth Amendment, the applicable standard is the same. Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996). Thus, the case law developed with regard to the Eighth Amendment prohibitions against cruel and unusual punishment is equally applicable to claims arising under the Fourteenth Amendment. Cottone v. Jenne, 326 F.3d 1352, 1357 n.4 (11th Cir. 2003) (citing Ingraham v. Wright, 430 U.S. 651, 671 (1977)).

In order to establish a claim for a violation under the Eighth Amendment, a plaintiff must show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical

needs." <u>Estelle</u>, 429 U.S. at 106.   This showing requires a plaintiff to satisfy both an objective and a subjective inquiry. <u>Farrow</u>, 320 F.3d at 1243 (citing <u>Taylor v. Adams</u>, 221 F.3d 1254, 1257 (11th Cir. 2000)).   A plaintiff must first show that he had an "objectively serious medical need."   <u>Id.</u>   "[A] serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"   <u>Farrow</u>, 320 F.3d at 1243 (citing <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir. 1994)).   In either situation, "the medical need must be 'one that, if left unattended, pos[es] a substantial risk of serious harm."   <u>Id.</u> (citing <u>Taylor</u>, 221 F.3d at 1258)(alteration in original); <u>see also</u> <u>Andujar v. Rodriquez</u>, 486 F.3d 1199, 1203 (11th Cir. 2007) (finding that a condition involving more than "superficial" wounds, affecting ability to walk, and pain that caused crying was objectively, sufficiently serious), <u>cert. denied</u> <u>sub. nom</u>, 128 S. Ct. 385 (2007).   Second, a plaintiff must establish that a defendant acted with "deliberate indifference" to this serious medical condition by showing: (1) subjective knowledge of a risk of serious harm (i.e., both awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists and the actual drawing of the inference); (2) disregard of that risk; and (3) conduct that is more than gross negligence.   <u>Bozeman v. Orum</u>, 422

F.3d 1265, 1272 (11th Cir. 2005).  Inadvertence or mere negligence in failing to provide adequate medical care does not rise to a constitutional violation.  <u>Farrow</u>, 320 F.3d at 1243.  Rather, "medical treatment violates the Eighth Amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir. 1991)(quoting <u>Rogers v. Evans</u>, 792 F.2d 1052, 1058 (11th Cir. 1986)).

Examples of deliberate indifference include *inter alia*: actual knowledge of a serious need for medical care, plus a failure to treat; delay in treatment, potentially "even for a period of hours"; "grossly inadequate care"; "a decision to take an easier by less efficacious course of treatment"; or medical care which is so cursory as to amount to no treatment at all." <u>Woods v. Miller</u>, 215 Fed. Appx. 796, 799 (11th Cir. 2007)(citing <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999)).  On the other hand, decisions such as whether an x-ray, additional diagnostic techniques, or other forms of treatment are indicated are "[c]lassic example[s] of matters for medical judgment." <u>Estelle</u>, 429 U.S. at 107. The course of treatment chosen by a medical official would appear to be such "a classic example of a matter for medical judgement." <u>Id.</u>  Thus, no constitutional violation exists where an inmate and a prison medical official merely disagree as to the proper course of medical treatment.  <u>Harris</u>, 941 F.2d at 1505.

At the outset, the Court rejects Defendants' contention that they are not liable in their official capacities because non-party PHS is the contracted provider of medical care to inmates at the Collier County Jail.  *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985)(noting "federal courts have consistently ruled that governments, state and local, have an obligation to provide medical care to incarcerated individuals . . . This duty is *not absolved by contracting* with an entity such as Prison Health Services. . . .[T]he county itself remains liable for any constitutional deprivations caused by the policies or customs of the Health Service.")  Nonetheless, "[t]he question of municipal liability under § 1983 is relevant only when a constitutional violation has occurred."  *Powell v. Barrett*, 496 F.3d 1288, 1318 (11th Cir. 2007)(citing *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996)).  Therefore, the Court must examine the record to determine if Plaintiff can establish a constitutional violation as to any of his medical claims.

**(1) Cancer:**

Plaintiff argues that Defendants Hunter, Freeman, and Bastys were deliberately indifferent to his various alleged serious medical needs.  Response at 10.  Plaintiff argues that "[a]s a result of being 'refused' follow-up [appointments] in 4-6 months, the initial symptoms of cancer . . . were allowed to develop into an advanced stage of malignant cancer."  Response at 14.  Plaintiff

predicates liability upon Defendant Hunter for his failure to
"initiate corrective action," and also on Defendants Bastys and
Freeman for their respective positions as commander and captain,
which require that they oversee the day-to-day operations at the
jail. Response at 20, 22.

Based upon the Court's review of the record, Plaintiff's
relevant medical visits are set forth chronologically as follows:
On May 6, 2004, Plaintiff filed a grievance to Captain Freeman
notifying him of his upcoming outside medical appointments "to
determine the extent of a new development of cancer." Pl's Exh.
43-a. This grievance also requested that the jail administration
not follow their policy of moving Plaintiff to sickbay prior to his
outside medical appointments. Id. The grievance did not specify
the type of doctor's appointment scheduled for Plaintiff or when he
was to attend the appointment. On June 29, 2004, a letter written
by a doctor from the Florida Cancer Specialists recommended that
Plaintiff see an Ear, Nose and Throat (ENT) doctor and further
noted that Plaintiff missed his ENT appointment previously
scheduled on June 12, 2004. Pl's Exh. at 8-A.

Three months later, in September 2004, the medical records
show that Plaintiff had a follow-up visit with a doctor regarding
his cancer and was "reassure[d]" that all of Plaintiff's biopsies
for cancer were negative. Pl's Exh. Dr. Robert's notes at 40-a.

This doctor referred Plaintiff to a pain management specialist in response to Plaintiff's complaints of pain.[8]  Id.

Medical records dated after the filing of the Complaint establish that Plaintiff saw the pain management specialist in February 2005, and was prescribed medication for pain.  Pl's Exh. Dr. Korunda's notes 41-a thru 41-b.  Again in 2005, Plaintiff complained of neck pain.  Pl's Exh. A at 2.  In response, Plaintiff was transported to an outside medical appointment where the doctor conducted a fiber-optic laryngoscopy, and based on the result from the laryngoscopy again determined that Plaintiff showed *no evidence* of cancer.  Id. (emphasis added).  The doctor's notes further indicate that Plaintiff's cancer would be considered "cured in a little over a year."  Id.

The medical records reveal that it was not until August 15, 2006, approximately two years *after* Plaintiff filed the instant Complaint, that doctors recommended a CT scan as a result of a "mass like density" in the right lung.  Pl's Exh. X-Cel Mobile Medical Imaging Inc. form at 12 (emphasis added).  On September 5, 2006, medical tests confirmed a suspicious mass in Plaintiff's lung.  Pl's Exh. Naples MRI and CT Center Record at 13.  Subsequent medical notes dated September 25, 2006, indicate that the mass did not respond to antibiotics and a biopsy was necessary.  Pl's Exh. PHS Authorization Letter at 14.  Plaintiff signed the form

---

[8]Shortly after being cleared of cancer in September 2004, Plaintiff initiated this action on September 14, 2004.  See docket.

indicating he read the outpatient surgery instructions.  Pl's Exh. Outpatient Surgery Instructions at 16.  Plaintiff had the biopsy on November 16, 2006, and was diagnosed with "moderately-differentiated squamous cell carcinoma."  Pl's Exh. DSI Laboratories Surgical Pathology Report at 19. Plaintiff then had a PET/CT scan of his whole body on December 12, 2006, which also indicated the lung mass was "compatible with primary lung neoplasm."[9]  Pl's Exh. Naples Diagnostic Imaging Centers at 21-a. The most recent medical document filed in this case shows that Plaintiff had an appointment with the Florida Cancer Specialists on January 4, 2007.  Pl's Exh. PHS Authorization Letter dated Dec. 4, 2006 at 23.

_____The Court assumes *arguendo* that Plaintiff's cancer is an objectively serious medical condition.  See McElligott v. Foley, 182 F.3d 1248, 1256 (11th Cir. 1999) (noting that parties did not disagree that cancer constituted a serious medical need).  The Court finds that the record establishes that Defendant Hunter, Bastys, and Freeman did not act with deliberate indifference to Plaintiff's cancer.  Even if the record can be read to establish that theses named Defendants had subjective knowledge of the risk of serious harm to Plaintiff because of the cancer, Plaintiff has not pointed to any evidence to establish that these named

---

[9]Accordingly to medcyclopaedia, the term "neoplasm" means: "New tissue, growth.  Used to indicate tumours, cancers." http://www.medcyclopaedia.com

Defendants disregarded that risk by conduct that was more than gross negligence.  Although Plaintiff alleges in conclusory fashion that the cancer returned as a result of being denied follow-up appointments, Plaintiff does not refer the Court to any portion of the record to indicate what type of doctor's appointments were missed, when or how often Plaintiff missed his appointments, or how the Defendants' actions or inactions were causually related to him missing the appointments.  Plaintiff admits, and his medical records from PHS establish, that Plaintiff regularly saw PHAS medical personnel, as well as outside medical specialists, including, *inter alia*, oncologists, radiologists, ENT doctors, dentists, periodontists, physical therapists, and doctors specializing in pain management.  Response at 17; see generally Pl's Exh. A at 2, 3-A, 3-B, 5-A thru 7, 9, 9-B; Defs' Response to Pl's Mot. at Doc. #58-14.  Plaintiff does not direct the Court to any specific portion of the record to substantiate his claims that he missed necessary follow-up medical appointments while his cancer was in remission as a result of Defendants Hunter, Freeman, and Bastys' actions or inactions.  Further, the record demonstrates that Plaintiff saw several PHS and several outside medical doctors after Plaintiff was re-diagnosed with cancer.  *supra* 13.  Based on the foregoing, the Court finds that defendants have met their burden and established an absence of a genuine issue of material fact, and are therefore entitled to summary judgment as to the

cancer-related claim both in their individual and official capacities.

**(2) Heart Condition:**

Plaintiff alleges that he has a "chronic heart condition" and was "refused prompt treatment and diagnostics from Plaintiff's heart specialist." See generally Complaint at 27-30; Response at 14-15. Plaintiff fails to identify the specific type of heart condition in his Complaint, or specific dates on which he was "refused prompt treatment." Based on a review of the medical records, it appears that Plaintiff had high blood pressure. Plaintiff claims that he told PHS about his high blood pressure, but was refused the blood pressure medication, which was previously prescribed by a physician unaffiliated with PHS. Pl. Exh. at 5a. Plaintiff submits a medical document from August 2002, which predates his incarceration, from the "Walk-In Clinic of Naples Medical Center" where Plaintiff apparently went for a blood pressure check and requested that the doctor refill his blood pressure medication. Pl's Exh. at 1. Plaintiff avers that as a result of not receiving this previously prescribed blood pressure medication, he suffered "black outs." Response at 15. Plaintiff also attaches an affidavit from two inmates, who state that they witnessed Plaintiff black-out and promptly notified deputies. Pl's Exh. Aff. of Cundiff and Tyler, Sept. 19, 2006, at 7. The inmates state that the deputies "called a code Green and had [Plaintiff]

-18-

transported to the medical department by wheelchair." Pl's Exh. Aff. of Cundiff and Tyler, Sept. 19, 2006, at 7.

An inmate's high blood pressure may or may not be a serious medical need. See Dickson v. Colman, 569 F.2d 1310, 1311 (5th Cir. 1978) (inmates' high blood pressure presented no "true danger" or "serious threat") (emphasis added).[10]   Here, Plaintiff presents an affidavit from two inmate witnesses who stated they witnessed Plaintiff black-out, which *Plaintiff attributes* to his untreated high blood pressure.  Plaintiff also produces a medical report dated prior to his incarceration to show a treating doctor outside of the jail prescribed him blood pressure medication.  The evidence reveals that PHS continued to treat Plaintiff's high blood pressure with medication, first Clonidine and then Capoten.  Pl's Exh. A, Memo dated Aug. 1, 2005, from Vickie Freeman and Dr. Calixto Caledron to Bastys.  The Court therefore concludes that Plaintiff's high blood pressure constitutes a serious medical condition.

The record establishes that at some point in time PHS decided to stop the blood pressure medication for the "*reported* high blood pressure," and determined instead that the proper course of treatment for Plaintiff's condition involved periodic monitoring of his blood pressure.  Pl's Exh. A (emphasis in original).  According

---

[10] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

to Defendant Freeman's August 1, 2005 memo, daily checks of Plaintiff's blood pressure were done in place of medication. Pl's Exh. 5-f, 5. The medical records suggest that in 2005, PHS checked Plaintiff's blood pressure approximately once a week, and in 2006 began daily checks. Pl's Exh. 5-f, 5-e.

None of the named Defendants are directly involved with the provision of medical care to the inmates. Aff. Hunter; Aff. Bastys; Aff. Freeman. Defendants argue that the record establishes that _they_ did not act with deliberate indifference to Plaintiff's medical need. Id. at 11. In Response, Plaintiff directs the Court to various letters he wrote to Defendants Hunter and Bastys and their respective responses, including Exhibits 23, 24, 26, 27, 34, 35, to support his argument that he apprised these supervisory defendants that PHS was not providing him medication for his medical needs. Response at 20-23. Plaintiff does not direct the Court to any specific part of the record to show he addressed any letters to Defendant Freeman; instead, Plaintiff generally references the Court to Exhibits A1-109. Id. at 25.

The letters addressed to Defendant Hunter contain a litany of complaints ranging from issues with the investigations conducted by the Professional Responsibility Bureau to unsanitary conditions at the jail. See Pl's Exh. 21, 22.[11] Plaintiff's letter to Defendant

---

[11]The Court also reviewed two additional letters written to Defendant Hunter, which were dated after Plaintiff filed the
(continued...)

Hunter only generally states an issue with medication: "refusal to provide effective medical treatment and prescribed medication." Pl's Exh. 21.  Of the exhibits referenced by Plaintiff, only one May 16, 2005 letter, is specifically addressed to Defendant Bastys. This letter was written to Defendant Bastys *after* Plaintiff initiated the instant action.   Pl's Exh. 35.   Similar to Plaintiff's letters to Defendant Hunter, this letter does not apprise Defendant Bastys of Plaintiff's high blood pressure, failure to receive blood pressure medication, or his black-outs.

Supervisory liability can be imposed under § 1983 when there are facts supporting an inference that the supervisor knew that subordinates would act unlawfully and failed to stop them. Cottone, 326 F.3d at 1360 (quoting Gonzalez, 325 F.3d at 1234) (remaining citations omitted).   However, none of Plaintiff's letters written to the supervisory Defendants make mention of Plaintiff's need for blood pressure medication or of his black outs. Significantly, many of these letters written after Plaintiff initiated the action in this case.  The Court finds that Defendants have established that there remains no question of material fact with regard to whether they were deliberately indifferent to Plaintiff's high blood pressure condition, and as such the Defendants are entitled to judgment in their individual and official capacities as to this claim.

---

[11](...continued)
Complaint *sub judice*.  Pl's Exh. 26-27.

**(3) Dental Needs:**

Next, Plaintiff complains of his treatment for his "dental condition."   See generally Response.   The Complaint does not identify the type of dental condition Plaintiff experienced, but avers only that Plaintiff was "refused dental treatment" for his "dental condition."   Response at 15.   Plaintiff avers that PHS' refusal to provide him dental treatment caused him "severe pain and bleeding."   Response at 15.   Defendants argue that they were not deliberately indifferent to Plaintiff's medical needs and refer the Court to the record.   Amend. Mot. SJ at 11.

Upon review of the medical records, the Court found a note from a dentist at PHS dated April 2005, which identifies Plaintiff's "dental condition" as "periodontal disease."   Pl. Exh. PHS Utilization Management Referral Review Form at 9-B.   This note from PHS refers Plaintiff to see a periodontist for an appointment in July 2005.[12]   Id.   A subsequent form from the periodontist dated July 14, 2005, identifies the condition as "advanced gingivitis with localized areas of moderate periodentitis."   Pl's Exh. PHS Authorization Letter at 10.   After Plaintiff's visit with the

---

[12]According to the American Academy of Periodontology, periodontal diseases, including gingivitis and periodontitis, affects the gums and bones supporting the teeth. In the "mildest form," the gums redden, swell, and bleed easily.   Untreated gingivitis can advance to periodontitis and with time if untreated, the tissues and bone that support the teeth are broken down and destroyed.   The symptoms are mild, but left untreated the teeth can become loose and may have to be removed.   See Amer. Acad. of Periodontology at www.period.org.

periodontist, the dentist affiliated with PHS reviewed the periodontist's recommendations and determined that the hygiene products Plaintiff received from the periodontist were "not medically necessary, at least in regards to the . . . chief complaint, which is directly related to his diagnosis of period[entitis] diseases [sic], for these hygiene products containing fluoride as the active ingredient would address dental cavies [sic] and its prevention as its primary indication for usage . . . not periodontal disea[se]." Pl's Exh. PHS Notes entry dated July 15, 2005 at 9a.

        With regard to Plaintiff's dental condition, upon review of the record, it appears Plaintiff experienced pain and his gums were bleeding. Pl's Exh. 24. The Court assumes *arguendo* that this medical condition is a serious medical condition. See generally Farrow, 320 F.3d at 1244-45 (finding prisoner who had bleeding, swollen gums, and two teeth slicing into his gums constituted a serious medical need); see also Newsome v. Chatham County Det. Ctr, Case No. 05-cv-042, 2007 WL 4201116 (11th Cir. Nov. 29, 2007)(noting that the district court and defendants assumed that a prisoner's medical need for dental work constituted a serious medical need).

        Defendants have established, however, that they did not act with deliberate indifference to Plaintiff's dental needs. Even if the record can be read to establish that the named Defendants had subjective knowledge of the risk of serious harm to plaintiff

because of the dental condition, the record shows that the PHS
doctors disagreed with the other doctors course of treatment for
the dental condition.  Pl's Exh. PHS Notes entry dated July 15,
2005 at 9a.   The records further indicate that Plaintiff was
provided prescriptions and a brush to help treat his dental
condition.  Pl's Exh. 24, dated Dec. 23 2004; Pl's Exh. 25-c, dated
Nov. 7, 2006; Pl's Exh. 26, dated April 15, 2005.  Plaintiff has
not pointed to any evidence in the record showing that a question
of material fact exists as to whether the named defendants
disregarded that risk by conduct that was more than gross
negligence.  Moreover, as previously stated, PHS is not a named
defendant in this action and Plaintiff's allegations pertain to
PHS.  See Complaint; Amend. Mot. SJ; Response.  Based on the
foregoing, the Court finds that Defendants have established that
they did not act with deliberate indifference to Plaintiff's dental
condition, and are therefore entitled to summary judgment as to
Plaintiff's dental-related claim both in their individual and
official capacities.

**(4) Vision Needs:**

The Complaint sets forth a vague claim related to Plaintiff's
"vision needs," which Plaintiff claims were not treated by the
jail.  The Complaint fails to indicate whether Plaintiff was near-
sighted, far-sighted, or had some other medical condition effecting
his vision.   The medical records reveal only that Plaintiff

-24-

required corrective lenses for his vision.[13]  Pl's Exh. Doctor's
prescription dated Feb. 21, 2005 at 14.   Plaintiff argues that
defendants refused to provide treatment for his "serious vision
needs claiming that [Plaintiff's] family and friends were to
provide treatment." Response at 15.  Plaintiff refers the Court to
his exhibits at A 32-39.  Id. at 31.   Plaintiff admits that the
medical department "finally provided [glasses] (Exhibit 34) [,] but
not the glasses [that] [were] fitted and prescribed by the
opthalmogist."  Id. at 31.  Defendants again refer to the record
and argue, irrespective of whether Plaintiff's vision needs
constituted a serious medical condition, they were not deliberately
indifferent to Plaintiff's medical needs. Amend. Mot. SJ at 10-11.

     Here, Plaintiff has not shown that his eye condition was
objectively sufficiently serious.   The Court could not find any
binding case law addressing whether an inmate's need for corrective
lenses constitutes an objectively serious medical need.  Assuming
arguendo that Plaintiff's need for corrective lenses constituted a
serious medical condition, the next step of inquiry requires the
Court to determine whether there remains a question of material
fact as to whether the defendants acted with deliberate

_____

     [13]The Court, upon thorough review of the medical record, found
a medical note written by an opthomologist, unaffiliated to PHS,
who determined that Plaintiff "should either wear glasses or have
his contact lenses replaced regularly."   Pl's Exh. Doctor's
prescription dated Feb. 21, 2005 at 14.  Thus, from a review of the
record it appears that Plaintiff preferred contact lenses, instead
of the eye glasses provided by the jail.

indifference.  Here, Plaintiff admits that he received eyeglasses.
The record establishes that Plaintiff's eye condition was treated
as he was provided eyeglasses.   Further, there is nothing in the
record evidencing a delay in Plaintiff receiving the eye glasses,
or,  assuming  there  was  a  delay,  whether  that  delay  harmed
Plaintiff.   As  such,  Defendants  are  entitled  to  judgment  as  a
matter of law in both.

   **(5) Back Condition:**

   Plaintiff  claims  he  had  a  "degenerative  back  condition,"
Response at 15, but only mentions his alleged back condition once
in his Response.   Otherwise, the record is entirely devoid of any
discussion  regarding  Plaintiff's  back  condition,  or  how  the
Defendants allegedly acted with deliberate indifference to his back
condition.   Thus,  there  is  no  evidence  that  Plaintiff's  back
condition  was  a  serious  medical  condition,  and  no  evidence  that
Defendants  were  deliberately  indifferent  to  that  condition.
Therefore,  Defendants  are  entitled  to  summary  judgment  as  to
Plaintiff's back condition claim.

   **B.   Fourteenth Amendment- Conditions of Confinement against
Defendants Hunter, Freeman, and Bastys:**

   Plaintiff  alleges  that  the  conditions  at  the  county  jail,
ranging from lack of hot water for showers to improper handling of
food, violated his constitutional rights.   See generally Depo. Pl.
Plaintiff attributes liability for his conditions of confinement to

Defendants Hunter, Bastys, and Freeman.  Depo. Pl. Part II at 82.
Notably, the Complaint and Plaintiff's Response fail to
specifically mention any particular conditions that violated
Plaintiff's constitutional violation.  Rather, Plaintiff vaguely
claims he was subjected to "severely overcrowded, substandard and
unsanitary conditions," and "extensive violations of the Florida
Model Jail Standards effecting the health and safety of inmates."
Response at 40-41; Complaint at 9-a.  Thus, the Court refers to the
Plaintiff's deposition testimony to ascertain how the conditions to
which Plaintiff alleges he was subjected fell below a
constitutional threshold.

According to Plaintiff's deposition, the jail has a "lack of
hot water" and poor sanitation, which Plaintiff alleges caused him
to incur three staph infections.  Depo. Pl. Part II at 80.
Plaintiff contends that the jail is "severally overcrowded" with
three people housed in a cell that has less than 25 feet of free
space.  Response at 38; Plaintiff. Depo. Pl. Part II at 81.  Before
the new jail[14] was built, Plaintiff states that 1,100 inmates were
housed in the jail certified for only 582.  Depo. Pl. Part II at
81.  Plaintiff "has been forced to sleep on the floor" on a pad and
had "ants crawling on his bed" in the medical block.  Response at
38, Depo. of Pl. Part I at 36.  Additionally, Plaintiff contends
that the jail does not adhere to proper food safety guidelines

---

[14]It is unclear when the "new jail" was built.

because officials let food sit at room temperature for hours before serving it.  Depo. Pl. Part II at 82.  Plaintiff opines that if the jail was a restaurant, the Florida Department of Health would close the restaurant.  Id.

Defendants dispute Plaintiff's allegations concerning his conditions of confinement and refer the Court to their voluminous exhibits, specifically referencing the jail's responses to Plaintiff's grievances, arguing that the record does not support Plaintiff's allegations.  Amended Mot. S.J. at 13.  Alternatively, Defendants argue that they did not act with deliberate indifference.  Id.  Moreover, Defendants argue that Plaintiff has not alleged how the conditions jeopardized his well being.  Id.

Because Plaintiff was a pre-trial detainee, the proper inquiry is whether the conditions amounted to punishment under the Due Process Clause of the Fifth or Fourteenth Amendments, not whether those conditions constituted cruel and unusual punishment under the Eighth Amendment.  Jordan v. Doe, 38 F.3d 1559, 1564-65 (11th Cir. 1994) (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)(utilizing Fifth Amendment Due Process Clause)); Hamm v. DeKalb County, 774 F.2d 1567, 1572 (11th Cir. 1985) (applying Fourteenth Amendment Due Process Clause) (internal citations omitted)).  Nevertheless, the "minimum standard" of ensuring inmates with "life's necessities" is the same regardless of the constitutional provision.  Jordan v. Doe, 38 F.3d at 1565 (referencing Hamm, 774 F.2d 1567, 1572 (11th Cir. 1985)).

To establish a claim based on prison conditions, an inmate must meet both an objective component and subjective component. Jordan, 38 F.3d 1559, 1564 (citations omitted). First, the condition must be objectively "sufficiently serious." Id. (citing Farmer v. Brennan, 511 U.S. 825 (1994) (quoting Helling v. McKinney, 509 U.S. 25 (1993)). "The objective component of an Eighth Amendment claim is . . . contextual and responsive to 'contemporary standards of decency.'" Jordan v. Doe, 38 F.3d at 1564 (citing Hudson v. McMillian, 503 U.S. 1, 112 S. Ct. 995, 1000 (1992)(quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)). Only a deprivation which denies "the minimal civilized measure of life's necessities," Rhodes, 452 U.S. at 347, is grave enough to violate the Eighth Amendment. Wilson, 501 U.S. at 298-99. The Court employs a "totality of conditions" test to determine if the conditions of confinement amount to a constitutional deficiency. Wilson v. Blankenship, 163 F.3d 1284, 1292 (11th Cir. 1998) (citing Hamm v. DeKalb County, 774 F.2d at 1576).

Second, a plaintiff must come forward with some factual allegations to show that the defendant official "acted with a sufficiently culpable state of mind." Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2005) (citing Hudson, 503 U.S. at 8). Negligence is not enough. Chandler, 379 F.3d at 1289. Rather, a plaintiff must show the a defendant acted with "deliberate difference." Id. Significantly, a defendant must: (1) have subjective knowledge of a risk of harm; (2) disregard that risk;

and (3) engage in conduct that rises above mere negligence.  Id. (citing Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003). "A plaintiff must also show that the constitutional violation caused his injuries."  Chandler v. Crosby, 379 F.3d 1278, 1290 (11th Cir. 2004) (citing Marsh v. Butler County, 268 F.3d 1014, 1028 (11th Cir. 2001)).

Plaintiff complains that the jail was "severally overcrowded" before the new jail was built.  He alleges that three people were housed in a cell and specifically states the jail housed 1,100 inmates when it was certified to house only 582 inmates.  Response at 38; Plaintiff. Depo. Pl. Part II at 81.  Based on Plaintiff's own assertions, it appears that prior to the additional space being added at the jail, the jail was *almost* at double capacity. However, the United States Supreme Court has found that even double capacity does not violate the constitution absent "deprivations of essential food, medical care, or sanitation."  Rhodes v. Chapman, 452 U.S. 337, 347-48 (1981).

Although Plaintiff complains of other conditions at the jail, including general issues of sanitation and lack of hot water, he does not state in his Complaint or his Response what sanitation problems he encountered, or for how long he experienced the deficient sanitation or lack of hot water.  Similarly, the record is entirely devoid of any facts substantiating what was wrong with the temperature in the cell and is entirely devoid of any specifics

concerning the alleged lack of hot water.  See generally Complaint;
Response; Defs' Amend. Mot. S.J. at 13-14.

With regard to Plaintiff's argument that sleeping on a pad on
the floor constitutes deprivation of his constitutional rights, the
Eleventh Circuit has found no constitutional claim exists when
inmates are required to sleep on the floor and are provided with
mattresses because the Constitution does not "require elevated beds
for prisoners."  Hamm, 774 F.2d at 1575; Brown v. Crawford, 906
F.2d 667, 672 (11th Cir. 1990).  With regard to Plaintiff's
allegations regarding the food, "[t]he Constitution requires that
prisoners be provided 'reasonably adequate food.'" Hamm, 774 F.2d
at 1575 (citations omitted).  "The fact that the food occasionally
contains foreign objects or sometimes is served cold, while
unpleasant, does not amount to a constitutional deprivation." Id.
(citations omitted).

Plaintiff's discomfort does not rise to the level of a
constitutional violation.  The conditions were not so extreme as to
have posed an "unreasonable risk of serious damage" to Plaintiff's
health or safety.  Chandler, 379 F.3d at 1290 (pointing out that
Eighth Amendment violations should not be found upon a judge's
subjective views).  The Constitution does not mandate comfortable
prisons. Rhodes v. Chapman, 452 U.S. 337, 348 (1981).  "If prison
conditions are merely 'restrictive and even harsh, they are part of
the penalty that criminal offenders pay for their offenses against

society.'" <u>Chandler v. Crosby</u>, 379 F.3d 1278, 1289 (11th Cir. 2004) (quoting <u>Rhodes v. Chapman</u>, 452 U.S. at 347 (1981)).

Even if the Court found that the totality of the conditions Plaintiff experienced were objectively sufficiently serious or extreme, the Court finds that the record is entirely devoid of any evidence suggesting that the Defendants acted with a sufficiently culpable state of mind.  The Defendants refer the Court to their numerous responses to Plaintiff's grievances, evidencing that the officers accommodated Plaintiff's various complaints about the conditions.  Amend. Mot. S.J. at 13-14.

Specifically, in response to Plaintiff's complaints about ants in his cell on September 7, 2004, a jail services employee informed Plaintiff that the officers in the cellblocks have access to bug spray to cure the bug problem.  Defs' Exh. 2J Inmate Grievance at Doc. #157.  Additionally, Commander Bastys advised Plaintiff that pest control was directed to spray the area as soon as possible. <u>Id.</u>  When Plaintiff generally complained about overcrowding and his cell's sanitation and ventilation on September 7, 2004, an officer from jail services told Plaintiff that a new addition was under construction, but that "bleach and cleaning set ups [sic] are delivered 3 times a day."  <u>Id.</u>  Again, Commander Bastys advised Plaintiff concerning the ventilation issues that an "air temperature control" report indicated that Plaintiff's cell maintained a constant temperature around "73 degrees."  <u>Id.</u> Similarly, an officer from the jail's food services responded to

Plaintiff's October 8, 2005 complaint[15] about "substandard food services," and the fact that "the hot lunch trays . . . had been sitting too long allowing the food to be served cold," Pl's Exh. Inmate Grievance at Composite H, that a dorm officer returned the hot meals to the kitchen to measure the temperature and the temperature of the food was "86 degrees." Id. Additionally, the jail's food services employee explained to Plaintiff that when the meals leave the kitchen, "they are at an acceptable temperature"; however, the kitchen cannot control the temperature once the meals leave the kitchen.  Further, the kitchen noted that out of all the inmates, "these complaints seem to occur with you [Plaintiff] and your witnesses.  Your dormitory will be observed closely to see if your allegations are warranted." Id.

Based on the record, the Court finds that there remains no question of material fact as to whether the Defendants were deliberately indifferent to Plaintiff's conditions of confinement and as such the Defendants are entitled to the entry of judgment as a matter of law.  In ruling on a motion for summary judgment, the Court need not credit an allegation of fact that is "blatantly contradicted by the record, so that no reasonable jury could believe it." Scott v. Harris, 127 S. Ct 1769, 1776 (2007).  As previously stated, the Court finds that the totality of Plaintiff's alleged conditions were not so extreme as to pose a danger to

---

[15]This grievance is dated **after** Plaintiff filed the Complaint.

Plaintiff's health or safety and, even if the Court found the totality of the circumstances extreme, the record is devoid of any evidence that the named Defendants acted with deliberate indifference to Plaintiff's conditions.[16]

**C. First Amendment- Interference with Access To Court Against Defendants Hunter, Freeman, Bastys, Hansen, and Cullen:**

Plaintiff avers that he was denied access to the jail's law library and was not provided with "assistance from people legally trained." Complaint at 8b. Plaintiff alleges that he was not permitted to conduct legal research himself; rather, he was required to provide Defendant Cullen with the exact case citation, in order for Defendant Hansen to conduct the legal research on his behalf. Depo. Pl. Part II at 72. With regard to Plaintiff's pending state criminal proceeding, Plaintiff states that although the jail's written policy permits inmates certain legal sources, the jail does not allow inmates any legal resources dealing with their pending criminal action if that inmate is represented by counsel in the action. Depo. Part II at 73-75.

As a result of Plaintiff's inability to conduct legal research, Plaintiff alleges that this Court dismissed one of his other § 1983 complaints[17] and two of his habeas petitions.[18]

_____

[16]Plaintiff states in his deposition testimony that he incurred a staph infection. However, Plaintiff does not refer the Court to any evidence in the record to support his contentions.

[17]Plaintiff states that his other section 1983 action that this
(continued...)

Plaintiff attributes the Court's dismissals of his cases on the premise that "Plaintiff's lack of legal skills . . . were totally ineffective to convince the Court of the injuries and damages Plaintiff is being subjected to as a result of being refused a speedy trial [and] effective representation" in his pending state criminal trial.  Complaint at 9.

Additionally, Plaintiff avers that the jail did not provide him with a pen for legal work.  Complaint at 8b.  Rather, Plaintiff explains that the Collier County Jail provides "flexible rubber pencils" instead of pens to the inmates.  Depo. Pl. Part I at 23. Plaintiff alleges that the pencils write so lightly that the writing is illegible and with time fades.  Depo. Pl. Part I at 23. Because the pencil lead fades over time, any duplicate copies are illegible.[19]  Plaintiff contends that his claims of denial of access to court are substantiated by the mere fact that he remains incarcerated as a pre-trial detainee.[20]  Response at 43-44.

Additionally, Plaintiff contends that the jail has a hundred-page copy limit for the duration of the inmate's confinement.

---

[17](...continued)
Court dismissed was case number 2:04-cv-304.

[18]Plaintiff's habeas petitions can be found at the following case numbers: 2:06-cv-259, 2:06-cv-104.

[19]The Court notes that the Complaint docketed at in this action on the Court's CM/ECF is illegible due to the pencil.

[20]As of the date on this Order, Plaintiff was in custody with the Florida Department of Corrections, not the Collier County Jail.

Depo. Part II at 65.   Thus, after Plaintiff reached his limit on copies, he claims the jail refused to provide him with additional copies.   Complaint at 8b, Depo. Pl. Part II at 65.   Plaintiff also claims that the jail provided him with delayed notary services, although, he does not state which, if any, of his legal documents required notarization.

In the Motion for Summary Judgment, Defendants argue that Plaintiff misconstrues the Supreme Court's meaning of "access to court."   Amended Mot. S.J. at 15.   Defendants cite to Lewis v. Casey, 518 U.S. 343 (1996), arguing that the United States Supreme Court made clear that "Plaintiff does not have a constitutional right to conduct generalized research, to conduct discovery, or to effectively litigate his cases in Court."   Amended Mot. S.J. at 15. Rather, the right of access to court is the right of inmates to present their grievances to a court.   Id. at 16.   Moreover, Defendants argue that Plaintiff has not shown that he has suffered real injury in a meritorious case as a result of the alleged interference.   Id.   Based on the foregoing, Defendants argue that they are entitled to the entry of summary judgment in their favor.

Interference with an inmate's access to the court constitutes a First Amendment[21] violation, which is actionable under 42 U.S.C. § 1983.   Lewis v. Casey, 518 U.S. 343 (1996); Bounds v. Smith, 430

---

[21]The protections of the First Amendment apply to the states through the Fourteenth Amendment.   See, e.g., New York Times v. Sullivan, 376 U.S. 254, 276-78 (1964) (applying the First Amendment to the states).

U.S. 817 (1977); Chandler v. Baird, 926 F.2d 1057 (11th Cir. 1991).
Prisoners are entitled to "a reasonably adequate opportunity to
present claimed violations of fundamental constitutional rights to
the courts." Bounds, 430 U.S. 825.

The Supreme Court made clear that a plaintiff who alleges a
denial of access to court claim must show how the interference
caused the plaintiff harm or prejudice with respect to the
litigation. Lewis, 518 U.S. at 349-351. "[A]n inmate cannot
establish relevant actual injury simply by establishing that his
prison's law library or legal assistance program is subpar in some
theoretical sense." Id. at 351. Indeed, "[t]he injury requirement
is not satisfied by just any type of frustrated legal claim." Id.
at 354. Specifically, a plaintiff must show that the denial of
access to court prejudiced him in a criminal appeal, post-
conviction matter, or in a civil rights action under 42 U.S.C. §
1983 "to vindicate 'basic constitutional rights.'" Id. (quoting
Wolff v. McDonnell, 418 U.S. 539, 579 (1974)). Moreover, a
plaintiff cannot establish injury unless the case that plaintiff
was unable to pursue had arguable merit. Lewis, 581 U.S. at 353;
Wilson, 163 F.3d 1291.

The Court finds that the record is devoid of any facts
establishing a connection between the Defendants' alleged
interference with Plaintiff's access to courts and this Court's
decision to dismiss any of the Plaintiff's cases. Notably, two of
the actions Plaintiff mentions were filed approximately two years

*after* Plaintiff filed the Complaint *sub judice*.[22]   Out of an abundance of caution, however, the Court will review the cases that Plaintiff contends he incurred harm or prejudice in, as a result of the Defendants' alleged interference.

The first case mentioned by Plaintiff was § 1983 action, which he filed on June 2, 2004.  See Case No. 2:04-cv-00304-FTM-29SPC. Plaintiff alleges that someone opened his mail in this case and removed his "indigent affidavit."  Response at 4.  The docket history, however, does not reflect that Plaintiff's action was filed without his affidavit of indigence.  See docket history in Case No. 2:04-cv-00304-FTM-29SPC.  In fact, the motion to proceed *in forma pauperis* with the affidavit of indigence was filed simultaneously with his Complaint. See id. at Doc. #2.  Nor does the docket history reflect that this Court dismissed Plaintiff's action for failure to file an affidavit of indigence.  Id. Order of Dismissal at Doc. #4.  In this § 1983 action, Plaintiff sued three of his court-appointed defense counsel in his pending state criminal action alleging ineffective representation.  Id. at Doc. #1.  The Court dismissed Plaintiff's Complaint without prejudice, noting that it appeared Plaintiff presented a premature habeas corpus claim, rather than a § 1983 action.  Id.  Order of Dismissal at Doc. #4.  The Court directed the Clerk of Court to forward the

---

[22]Case numbers 2:06-cv-104 (Habeas Petition) and 2:06-cv-259 (Habeas Petition).

standardized form used in habeas actions to Plaintiff. <u>See</u> generally docket.

The next action Plaintiff alleges was dismissed by this Court as a result of the Defendants' interference was his Petition for Writ of Habeas Corpus, filed on February 22, 2006. <u>See</u> Case No. 2:06-cv-00104-FTM-29DNF. The Petition named Sheriff Don Hunter as the only Respondent.[23] <u>Id.</u> The Court dismissed the Petition without prejudice on May 3, 2006. <u>Id.</u> at Order of Dismissal Without Prejudice, Doc. #8. The Court noted that the Petition for Writ of Habeas Corpus included only claims stemming from alleged deliberate indifference to medical care, interference with access to courts, and jail conditions.[24] <u>Id.</u> Thus, the Court directed Plaintiff to file a § 1983 Complaint, not a habeas action. <u>Id.</u>

The last action in which Plaintiff avers he was prejudiced or harmed as a result of the Defendants' interference was a Habeas Petition filed pursuant to 28 U.S.C. § 2241 on May 23, 2006. <u>See</u> Case No. 2:06-cv-00259-JES-DNF. This action remains pending before this Court and on September 4, 2007, this Court served the Petition on Respondents and directed them to file a Response. <u>Id.</u> Order to Show Cause to Respondents, Doc. #19.

---

[23]Plaintiff's habeas petition was filed pursuant to 28 U.S.C. § 2241.

[24]The claims included in Plaintiff's Petition sounds identical to the claims in the instant Complaint.

Based on the record, it is evident that the Defendants' alleged interference with Plaintiff's access to the courts did not cause Plaintiff to suffer any harm or prejudice in a meritorious action. The Court dismissed one of Plaintiff's civil rights actions without prejudice and one of Plaintiff's habeas actions on grounds entirely unrelated to those mentioned by Plaintiff. Thus, the Court finds that the Defendants are entitled to judgment as a matter of law on Plaintiff's access to Court claim because Plaintiff sustained no actual injury as a result of the Defendants' alleged interference.

**D. First Amendment: Interference with Mail Against Defendants Hunter, Freeman, Bastys, Hansen, and Cullen:**

Plaintiff alleges that Defendants violated his First Amendment rights as he claims that the Defendants "engaged in a systematic pattern of intentional obstruction, delay and denial of legal materials and resources, including tampering and obstruction of U.S. Mail" beginning in approximately February, 2004. Response at 40, Depo. Pl. Part I at 21. Plaintiff also refers the Court to his Exhibits B-001 thru B-066 and "Composite Exhibit D," claiming that the Defendants "tamper[ed] and obstruct[ed] . . . [his] U.S. mail." Response at 40, 42-43.[25]  Further, Plaintiff avers his claims are

---

[25]As stated above, Plaintiff claimed someone at the jail removed his affidavit of indigence from his mail in his § 1983 Complaint filed in 2004, but a review of the docket in that action evidenced that his affidavit was filed simultaneously with the Complaint.

"substantiated by the irrefutable fact that Plaintiff remains unlawfully incarcerated as a pre-trial detainee after over forty (40) months." Id. at 43-44. Other than these statements, Plaintiff's Complaint and Response include no other allegations pertaining to the alleged interference with his mail.

According to Plaintiff's deposition, Plaintiff states that the jail interfered with both his outgoing personal and legal mail. Pl's Depo. Part 1 at 20. The deposition, however, contains no further factual averments concerning the alleged interference with Plaintiff's outgoing "personal" mail, but does include specifics regarding the alleged interference with Plaintiff's outgoing "legal" mail.

Plaintiff states that he first noticed that the jail was interfering with his legal mail when a grievance he filed on his public defender was not received by the Florida Bar Association. Pl's Depo. Part I at 21. Plaintiff states that his outgoing legal mail would be returned to him after it was opened. Depo. Pl. Part 2 at 69-70. In one instance involving mail addressed to this Court, Plaintiff had the jail's control tower deputy tape the torn envelope and re-mail it to the Clerk of Court in the federal court. Pl's Depo. Part II at 70. Plaintiff states there are approximately four or five envelopes that he mailed to this Court that had been opened and taped back together. Pl's Depo. Part II at 70.

Plaintiff states that he does not know who specifically opened the mail because it was never done in his presence, but believes

-41-

Defendant Hansen opened his mail.  Pl's Depo. Part II at 69.  He admits in his deposition, however, that he does not believe Defendants Hunter, Bastys, or Freeman opened his mail.  Id. at 68-69.  As a result of opening the mail, Plaintiff claims Defendant Hansen knew when he was writing with a pen, which is considered contraband, and would direct other officers to shake-down Plaintiff's cell to find the pens.  Pl's Depo. Part II at 54.  Also, Plaintiff alleges that between eight to ten times he missed a filing deadline with the court or a case was dismissed because of the jail's interference with his mail.  Pl's Depo. Part II at 69.

Additionally, Plaintiff states that the jail refused to mail Plaintiff's letters marked "legal mail" and addressed to ABC, NBC, and Fox News, explaining that his letters to these news agencies were not "legal mail."  Depo. Pl. Part II at 78.  Plaintiff contends that he wanted to call individuals from these news agencies as witnesses in this case.  Depo. Pl. Part II at 78.  Further, Plaintiff states that letters to the FBI and Federal Marshals were "obstructed."  Depo. Pl. Part II at 79.

In response to Plaintiff's mail claim, Defendants maintain that "the record evidence does not support a finding that Plaintiff's constitutional rights were ever violated by Defendants" and reference the Court to numerous grievances and responses thereto.  Amend. Mot. S.J. at 17.  In pertinent part, these grievances concern the lack of notary services available for Plaintiff's legal documents, the jail's failure to provide him with

certain addresses for Defendants, and alleged opening of his outgoing mail. See e.g. Def's Exh. at Doc. #158, Doc. #155. In particular, Defendant Hansen responded to one of Plaintiff's grievances concerning his mail, stating that the officers follow the jail's policies concerning mail and never open legal mail outside of the inmate's presence. Id. at Doc. #155. Additionally, in support of their motion, Defendants Hansen and Cullen filed affidavits testifying that they never opened any of the Plaintiff's mail in contravention to the jail's policy concerning mail. Aff. Cullen at Doc. #147-2, Exh. E; Aff. of Hansen at Doc. #147-2, Exh. D. Defendants argue that Plaintiff has not presented any evidence to support his claim against Defendants Hansen and Cullen. Id. Based on the foregoing, Defendants argue that the Court should grant their motion. Id.

Interference with an inmate's "legal mail" implicates an inmate's right of access to courts and free speech as guaranteed by the First and Fourteenth Amendments of the United States Constitution. Pocunier v. Martinez, 416 U.S. 396, 417 (1974), over ruled in part Thornburgh v. Abbot, 490 U.S. 401, 411-414 (1989) (overruling Martinez to the extent that the case distinguished incoming mail from prisoners verses incoming mail from non-prisoners in determining the appropriate standard of review); Al-Amin v. Smith, 511 F.3d 1317 (11th Cir. 2008). In addition to the prisoners, the prisoners' correspondents have an interest in uncensored communication by letter grounded in the First and

Fourteenth Amendments.  Martinez, 416 U.S. at 417.  "Censorship" means either the direct practice of refusing to deliver mail from prisoners to outside correspondents or vice versa, or the indirect interference, such as, writing an inmate with an "objectionable letter" a disciplinary report.  Taylor, 532 F.3d 462, 469 (5th Cir. 1976)(explaining Martinez, 416 U.S. 396).  While inmates have a legal right to receive mail from their counsel uncensored by prison officials, opening legal mail in the presence of the inmate does not constitute "censorship" when the mail is not read.  Wolff v. McDonnell, 418 U.S. 539, 577 (1974); Lemon v. Dugger, 931 F.2d 1465, 1467 (11th Cir. 1991).

A prison regulation regarding outgoing inmate correspondence must be "generally necessary" to a legitimate governmental interest.  Thornburgh, 490 U.S. at 411 (interpreting Martinez, 416 U.S. 396); Spradley v. Sistrunk, Case No. 2:92-cv-136-FTM-17D, 1996 WL 467511 *4 (M.D. Fla. Aug. 13, 1996)(citing Thornburgh, 490 U.S. at 414).  There must be "a 'close fit' between the challenged regulation and the interest purported to serve."  Thronburgh, 490 U.S. at 411. Indeed, outgoing correspondence is less of an issue for prison security and order than the implication of incoming materials.  Id.  The Courts have recognized, however, that the rights of inmates must be exercised with due regard for the "'inordinately difficult undertaking' that is modern prison administration."  Thornburgh, 490 U.S. at 407.  Prison officials may impose regulations necessary for the operation and

administration of the facility, including inspecting the contents of the prisoners' outgoing mail as long as "accompanied by minimum procedural safeguards." <u>Martinez</u>, 416 U.S. at 417; <u>see also Al-Amin</u>, 511 F.3d at 1333-1334.

The Court notes that Plaintiff does not challenge a policy set forth by the Collier County Jail regarding the inspection of the inmates' outgoing mail. Rather, Plaintiff maintains that his constitutional rights were violated when the jail interfered with his outgoing mail. The record evidences that the jail's interference was a delay in mailing Plaintiff's correspondence. The only letters Plaintiff states the jail "refused" to mail were his letters to the news stations marked "legal mail."

Although Plaintiff alleges that some of his mail the jail interfered with was "legal" mail, Plaintiff's examples, including a letter addressed to the Florida Bar in which he wrote a complaint about an attorney and letters to news stations, do not constitute legal mail. <u>See generally Taylor v. Sterrett</u>, 532 F.2d 462 (5th Cir. 1976) (correspondence addressed to the courts, prosecuting attorneys, parole or probation officers, and identifiable attorneys is privileged); <u>Lemon</u>, 931 F.2d at 1467 (letters to a prisoner's attorney constitutes legal mail). Plaintiff does allege, however, that his mail to this Court, which constitutes legal mail, was returned to him with the envelope opened. <u>See Id.</u> However, Plaintiff does not allege that the jail refused to mail the envelope to the Court, nor does he claim anyone read the mail. The

only mail that Plaintiff states the jail "refused" to mail were his letters to the news stations.  Plaintiff attributes liability on Defendants Hansen and Cullen for the interference with his mail. Defendants Hansen and Cullen file affidavits testifying that they did not open Plaintiff's mail in contravention of a jail policy. Plaintiff does not go beyond the pleadings by presenting evidence to contradict the Defendants' affidavits and show an existence of an issue of material fact.  As such, Defendants are entitled to the entry of summary judgment in their favor.

Additionally, to the extent Plaintiff alleges that Plaintiff incurred harm or prejudice as a result of the jail's interference with his mail in that he missed filing deadlines with the court or a case was dismissed, the record does not support his contentions. See Al-Amin, 511 F.3d at 1333 (noting the plaintiff's access claim failed because he alleged no actual injury in a case where interference with jail mail was also at issue).  As discussed above, the Court reviewed the case numbers referenced by Plaintiff and found Plaintiff incurred no harm or prejudice as a result of the alleged interference.  Pl's Depo. Part II at 69.

ACCORDINGLY, it is hereby

**ORDERED**:

1.  Defendants' Amended Motion for Summary Judgment (Doc. #201) is **GRANTED**.

2.   The Clerk of Court shall terminate any pending motions, enter judgment accordingly, and close this case.

**DONE AND ORDERED** in Fort Myers, Florida, on this __12th__ day of May, 2008.

JOHN E. STEELE
United States District Judge

SA: alj
Copies: All Parties of Record